MRS. CARRIE BELL BATTLE, MOTHER AND GUARDIAN AD LITEM OF DAVID BATTLE AND CHARLES ANDREW BATTLE, SONS; DAVID DANIELS, DECEASED EMPLOYEE v. BRYANT ELECTRIC COMPANY, INC., EMPLOYER, AND AMERICAN AUTOMOBILE INSURANCE COMPANY, CARRIER

No. 7215IC280

(Filed 12 July 1972)

Master and Servant § 62— workmen's compensation — death prior to leaving for work — employer's truck

The death of an employee who was crushed by the dump body of his employer's truck while warming up the truck before he ate breakfast preparatory to going to the job site arose out of and in the course of his employment where the employer regularly furnished the employee a truck for transportation to and from the job site, and the employee customarily warmed up the truck before he ate breakfast each morning.

APPEAL by defendant from Opinion and Award of the North Carolina Industrial Commission filed 12 November 1971.

The evidence, except where quoted, tended to show that the deceased, David Daniels, was living in Wilmington prior to his death at Moncure on 9 May 1970, and he was a pipe layer employed by the Bryant Electric Company, Inc. (Bryant) on the date of his death. At that time Bryant had two small projects at Moncure, one with Allied Chemical and the other with Evans Product. The two projects were about two miles apart. While working in Moncure, the deceased was staying at a rooming or boarding house about two miles from the job site. This rooming house had been recommended to the deceased's foreman as a place for the workmen to stay while they were away from Wilmington, and he knew that the deceased was staying there.

On Friday night, 8 May 1970, the deceased, together with the foreman and some of the other workmen, worked in Moncure until about midnight installing a "raw water tank" near the Haw River, and the foreman, Mr. W. B. Ladner, instructed the deceased to take a company-owned dump truck as transportation to his rooming house and to return to the job "around six" the following morning. The men usually returned to their homes in Wilmington on Friday nights, but on this occasion it was necessary to return to the job site on Saturday and fill in dirt around the water tank to prevent the possibility of it washing out should the river rise, as it had done on a previous occasion. After this filling in was completed, the men planned to return to Wilmington.

The deceased had no function or duties in connection with the Bryant dump truck that the foreman instructed him to take, other than to drive it back and forth from his rooming house to the job site. Occasionally, the deceased would pick up some of the other men who lived in the same area and take them to or from work, or would take them to and from lunch in the truck. When the deceased was not going to return to the work site, he would leave the truck at the plant. The only tools on the truck were some hand tools, such as "shovels, picks, and boots."

About ten minutes before six o'clock on the following morning (9 May 1970), the deceased, before breakfast, was seen in

the truck with the motor running. The owner of the "rooming and boarding place" where deceased was living testified:

" * * * The next time I saw him was that Saturday morning. I was going to call him and tell him to come eat. I heard the truck running. That was about ten 'til six. I usually fixed breakfast for him in the morning. I was looking out my picture window. He got out of the truck and went on the side. I was going to call. I didn't see him anymore. This boy ran out hollering. I ran out the door to see what was the matter, and I saw Mr. Daniels under the truck.

When I first looked out to call him I heard the motor running. I don't remember whether the motor was running when I went outside. I was so excited after I saw him pinned under the truck, I ran back and started hollering for my husband to come. * * *

* * * I was not there when his body was taken from under the dump part of the truck. I was trying to get an ambulance. When I came back, my sister and her husband were trying to get him out. I was not there when they took him out. I had run back to the house to call an ambulance. I got there when he was laying down on the side of the truck.

His pocketbook was given to me. It was taken out of his back pocket. I saw it taken out of his hip pocket. It contained a hundred and some few dollars. I saw my brother take it from his hip pocket. He gave it to me. I gave it to Mr. Ladner.

Mr. Daniels never used the truck when he was off work for his personal use. I never saw him with it. If he did, it was while I was working. I never saw him use it for his personal use."

Plaintiff's witness Lacy Stacker testified that he lived where the deceased was living and knew him and said:

" * * * I helped to get him out from under the dump. I raised the dump. I did not know how to raise it, I just messed with every lever until I found the right one. The engine was off until my stepfather tried to start the engine. I got inside and tried every lever. I tried every

lever and got it raised. When I raised it, the tools fell off. All of the tools had been in the back of the truck until it was raised by me. Then we could get Mr. Daniels' body out. There were no tools there by him where he was. There were no tools by him or on the ground or in the truck. * * * I knew of Mr. Daniels' going out to the truck before breakfast on other occasions because the truck is parked right there by my bedroom when it is parked and I could hear it when it starts up. He started it on other occasions, like getting up in the morning and warming it up like you might do your car. * * * "

The autopsy report was introduced into evidence and indicated that the deceased was "crushed by hydraulic press" and that the probable cause of his death was "crush injury of chest and abdomen."

Plaintiff's evidence tended to show that David Battle and Charles Andrew Battle were the illegitimate children of the deceased.

Defendant's evidence tended to show that after the deceased's body was removed from the truck on 9 May 1970, the truck and dump body were tested and there was no malfunction —the dump body worked properly in the way it was designed to work. There was nothing about the truck that could be serviced from the place where the body of the deceased was found. There was a "shiny," clean space underneath the truck at a place where no other part of the truck body touched, but nothing could be hidden there that could not be seen. Defendant and its carrier investigated the accident and were unable to determine what the deceased was doing at the time he was crushed by the dump body.

The hearing commissioner found that on 9 May 1970 the deceased sustained an injury by accident arising out of and in the course of his employment with the defendant employer, which accident resulted in his death on the same date, and made an award as provided by statute to the two minor illegitimate children of the deceased. Upon appeal, the Full Commission adopted as its own the opinion and award of the hearing commissioner. From the opinion and award of the Full Commission, the defendants appealed to the Court of Appeals.

*Beech & Pollock by H. E. Beech for plaintiff appellees.*

*Smith, Moore, Smith, Schell & Hunter by Stephen P. Millikin for defendant appellants.*

MALLARD, Chief Judge.

The only question brought forward and presented on this appeal is whether the Industrial Commission committed error in finding and concluding that the injury to and death of David Daniels arose out of and in the course of his employment with the defendant employer.

"The phrases 'arising out of' and 'in the course of' the employment are not synonymous, but involve two distinct ideas and impose a double condition, both of which must be satisfied in order to render an injury compensable. The words 'out of' refer to the origin or cause of the accident, and an accident arises out of the employment if there is a causal connection between the accident and the employment, or if the accident is the result of a risk originating in the employment or incidental to it. * * *

* * *

Where the cause of the accident is unexplained but the accident is a natural and probable result of a risk of the employment, the finding of the Industrial Commission that the accident arose out of the employment will be sustained; but where the cause of the accident is known and such cause is independent of, unrelated to, and apart from the employment, and results from a hazard to which others are equally exposed, compensation is not recoverable.

The words 'in the course of' the employment refer to the time, place, and circumstances of the accident, and an accident arises in the course of the employment if it occurs while the employee is engaged in a duty which he is authorized or directed to undertake or in an activity incidental thereto." 5 Strong, N. C. Index 2d, Master and Servant, § 55.

In *Hardy v. Small*, 246 N.C. 581, 99 S.E. 2d 862 (1957), it is said:

"The basic rule is that the words 'out of' refer to the origin or cause of the accident, and that the words 'in the

Battle v. Electric Co.

course of' refer to the time, place and circumstances under which it occurred. *Conrad v. Foundry Co.*, 198 N.C. 723, 153 S.E. 266; *Alford v. Chevrolet Co.*, 246 N.C. 214, 217, 97 S.E. 2d 869.

\* \* \*

An injury does not arise out of and in the course of the employment unless it is fairly traceable to the employment as a contributing proximate cause. Hence, injury by accident is not compensable if it results from a hazard to which the public generally is subject. *Walker v. Wilkins, Inc.*, 212 N.C. 627, 194 S.E. 89; *Marsh v. Bennett College*, 212 N.C. 662, 194 S.E. 303, tornado cases; *Plemmons v. White's Service, Inc.*, 213 N.C. 148, 195 S.E. 370, mad dog case."

The evidence in this case tends to show that on this occasion the deceased was engaged in a special emergency job to cover the exposed water tank so that it would not float out of the hole in which it had been placed if the river should rise, and that the accident occurred on a Saturday, which was outside regular working hours. The truck that killed deceased customarily had been furnished to him by the employer as a means of transportation to and from the work sites. Also, he habitually warmed up the truck each morning preparatory to going to the job site before he ate breakfast.

On the morning in question the deceased "was going back to work at six" to help fill in dirt around the tank. It was ten minutes until six and before he had eaten breakfast when his landlady saw him warming up the truck. Perhaps the deceased may have thought he was late in going to work, or perhaps he detected something wrong with the truck while he was warming it up and had decided to attempt to fix it, but the record is silent as to how and why he got under the dump body and as to how or what caused it to come down on him and crush him between it and the chassis of the truck. It is not necessary, however, for a plaintiff in such cases to offer evidence explaining the exact cause of the accident. *Puett v. Bahnson Co.*, 231 N.C. 711, 58 S.E. 2d 633 (1950) and *Robbins v. Hosiery Mills*, 220 N.C. 246, 17 S.E. 2d 20 (1941). See also 99 C.J.S., Workmen's Compensation, § 235. Whatever caused this accident, it must have happened very quickly because the landlady was close enough to hear the truck running while the deceased was warming it up, and there is no evidence that she

heard him make any outcry before he was crushed to death by the truck.

The use by the deceased of the employer's truck on this occasion was convenient and advantageous for both employer and employee, and the evidence tends to show that the employer regularly furnished this employee a truck for transportation to and from the job.

In 1 Larson, Workmen's Compensation Law, §§ 17.00 and 17.10, it is said:

> "When the journey to or from work is made in the employer's conveyance, the journey is in the course of employment, the reason being that the risks of the employment continue throughout the journey.
>
> * * * The justification for this holding is that the employer has himself expanded the range of the employment and the attendant risks. He has, in a sense, sent the employee home on a small ambulatory portion of the premises, just as the sailor on a British ship is conceived to be on a little floating fragment of Britain herself."

We hold that the fatal accident in this case was the result of a risk originating in and traceable to the employment. It is uncontradicted that the deceased was killed by the vehicle furnished him by the employer for transportation, and the evidence is sufficient to show that his death occurred at a time when he was preparing the truck as he customarily did for the return trip to the job site. See *Beck v. Ashton*, 124 Pa. Super. 307, 188 A. 368 (1936) and 99 C.J.S., Workmen's Compensation, § 235. We also hold that the evidence was sufficient to support the finding that the deceased sustained an injury by accident arising out of and in the course of his employment with the defendant employer, which accident resulted in his immediate death, and that the award of compensation was proper.

Affirmed.

Judges CAMPBELL and BRITT concur.