I disagree with the majority.
No witness claims to have seen the accident at issue. The plaintiff testified that he was alone in the back room of his employer's store sorting through damaged merchandise left near the trash compactor, and, "[T]he next thing I knew, I was sitting on the floor, and there was just stars going everywhere in my eyes." Looking around, he discovered a long metal rail on the floor near him and another leaning up against the wall near a ladder and he believes that the one on the floor fell, striking him in the head. He also told one of his treating physicians that he believes one of the rails must have been sitting on an empty dog food bag and it fell when he moved the bag to throw it in the trash. Claimant crawled to the baler, pulled himself up, and went to the break room to seek help. (Tr. p. 25). When Mervyn Losing got to the break room, he spoke with a co-worker, Ms. Debbie Jones. (p. 4-5). He asked Jones for aspirin, told her that he had a headache, explained that he suffered a blow to the head, and asked Jones to look to see if his head was bleeding.
With respect to the rails, however, a witness testifying for Food Lion stated that the rails, which weighed "about fifty, sixty pounds", were stored behind a metal ladder attached solidly to a concrete block wall and that there wasn't any way the rails could have fallen from that position. This leads to a number of possibilities: (1) the Food Lion witness was mistaken; (2) the Food Lion witness was trying to cover up her own malfeasance in not storing the rails behind the ladder as instructed; (3) the Food Lion witness was telling the truth, and the plaintiff was mistaken about what hit him. Unfortunately, plaintiff did not see the rail fall, or he could have testified that it fell on him. However, nobody else saw it either.
In my view, the majority gives undeserved weight to the testimony of Debbie Jones, the store's customer service manager. She said she and another employee, Earl Hayes, had been working in the back room cleaning up damaged goods prior to the time that plaintiff undertook the same task. (Thus she has an interest in protecting herself if she and/or her co-worker left the rails unsecured.) She testified that, around 3 p.m. on 26 October 1994, plaintiff came by the office and asked if she had any aspirin, told her he had a headache and said that something had hit him in the head. She said plaintiff asked her to look at his head to see if it was bleeding, which she did. (This testimony is totally consistent with plaintiff's version of the accident.) She said she could find no bleeding and no "indenture", which she defined as a dent mark. (This is also consistent with plaintiff's version of the accident. The rail had a broad side, which, if it hit his head, would not have caused a cut or a dent. Also, Jones admitted that she had never suffered a concussion, that nobody in her family had ever suffered a concussion and that she had never seen anyone right after they suffered a concussion. When asked what plaintiff's head should have looked like if had suffered a concussion, she said: "I've never seen anybody with a concussion, so I don't know." (Tr. P 19, 20-23)
What I find to be totally incredible about Debbie Jones' testimony is this: On direct examination by plaintiff's attorney, Ms. Jones testified, "It was like a day or two later that I learned that there was (a) rail back there that he said hit him on the head." (Tr. P7, L 5-6). Yet on cross by defendant, she testified that she went back into the back room on 26 October (about an hour and a half after plaintiff was in the breakroom talking about his recent vacation and not about any injury) to carry some trash back there to put at the door and she observed the rails leaning against the wall behind the ladder. Why she would pay any attention at all to the rails when she had not been told that a rail was involved in the accident is indeed remarkable. Of course her testimony about the location of the rails came long after she knew that plaintiff had indicated that a rail struck him and long after she may have realized her malfeasance in leaving the rails unsecured.
The objective medical evidence is that plaintiff suffered a concussion on 26 October 1994. This evidence came from the doctor who treated him and from all other doctors whose records and/or depositions were entered into evidence. Yet, the Deputy Commissioner and the majority find no objective evidence of an injury!
On the day following the injury, plaintiff sought and received medical care at Durham Urgent Care, and was released to return with restrictions. (Stipulated Medical Exhibit B). He returned for various follow-up examinations, but still failed to get relief from his debilitating headaches. (Stipulated Medical Exhibits E-G). The doctors at Durham Urgent Care diagnosed Losing with a concussion and headaches.
Plaintiff worked less than a full day on the two days immediately after the accident. (p. 33). He experienced headaches whenever he exerted himself. (p. 33). He had never before experienced such severe headaches and could not get relief from taking aspirin. (p. 34). The headaches interfered with his ability to perform his duties at work since he was having difficulty with his memory, and physical exertion caused his problems to get worse. (p. 38). Losing requested that he be referred to another doctor after several visits to Durham Urgent Care. (p. 39). He was referred to Dr. Bertics, a neurologist. (p. 39; Bertics Transcript p. 6).
Dr. Bertics testified that plaintiff was referred to him by Dr. Armstrong at the Durham Urgent Care Facility. (Bertics Transcript p. 6). His patient reported problems "with headache and some problems with his memory." (Bertics Transcript p. 6). He reported symptoms that constituted a "typical presentation and typical set of complaints" following a head injury. (Bertics Transcript p. 7). He also presented complaining of "cluster headaches," which Dr. Bertics related to plaintiff's head injury. (Bertics Transcript p. 9). Dr. Bertics diagnosed plaintiff as suffering from post-concussion syndrome with cluster headache related to that injury. (Bertics Transcript p. 10). Bertics had no reason to doubt that plaintiff's injury resulted from the events that plaintiff reported. (Bertics Transcript p. 11).
After the initial evaluation and a course of medication, Dr. Bertics recommended that plaintiff undergo cognitive testing. (Bertics Transcript p. 12). Dr. Bertics recommended the cognitive testing to obtain an understanding of plaintiff's present level of mental function. (Bertics Transcript p. 13-14). However, defendant refused to authorize such cognitive testing for a long period of time although it would have been the most objective evidence of concussion.
Based on his first several examinations of plaintiff, Dr. Bertics recommended that he undergo biofeedback therapy. (Bertics Transcript p. 20). Dr. Bertics opined that such therapy was medically indicated. (Bertics Transcript p. 20). Dr. Bertics also recommended that plaintiff undergo a course of physical therapy. (Bertics Transcript p. 20). The self-insured employer authorized neither program or treatment.
Effective December 16, 1994, Dr. Bertics released plaintiff to return to work on a "half-time" basis. (Bertics Deposition p. 23; Stipulated Medical Exhibit 3). The doctor was trying to return plaintiff to employment slowly, with the intention of gradually increasing his hours as his physical condition improved. (Bertics Deposition p. 23). When Dr. Bertics did this, plaintiff related to him that his employer wanted him to return to full-time duties, or not at all. (Bertics Transcript p. 23). Consequently, Dr. Bertics "put him on complete disability" effective January 18, 1995. (Bertics Transcript p. 24). Dr. Bertics again recommended that plaintiff undergo cognitive testing, stating that such testing "is essential." (Stipulated Medical Exhibit 4, p. 6).
On or about December 21, 1994, plaintiff contacted Food Lion's claims handler. (p. 41-42). She informed plaintiff that his claim had been denied "because [he] had a record of previous headaches." (p. 42). Plaintiff did NOT have a history of headaches. (p. 42, 45). She called plaintiff later the same day, and informed him that she was wrong about the "history of headaches," but that she had denied the claim because there was no "proof of injury." (p. 42)
Dr. Bertics testified that there was no reason why plaintiff could not have returned to work with restricted duties and hours during the course of his treatment other than the refusal of his employer to accept his restrictions. (Bertics Transcript p. 27). Likewise, as of the date of Dr. Bertics' deposition, there was no reason why plaintiff could not have returned to work from a medical standpoint, so long as his hours and activities were restricted. (Bertics Transcript p. 27). Food Lion determined that plaintiff either needed to work full duties with no limits on his hours, or not at all. In fact, plaintiff did so because the store manager informed him that he had received a call from the Food Lion home office, and was told that if plaintiff could not work more than four hours per day, he should not work at all. (p. 49). Plaintiff would have continued working under the restrictions imposed by Dr. Bertics if he had been allowed to do so. (p. 50).
Despite Dr. Bertics' recommendation that plaintiff undergo neurocognitive testing, biofeedback or physical therapy, Food Lion declined to authorize it. Ultimately, Food Lion did approve a neurocognitive evaluation, but not until May, 1995. Dr. Bertics testified that this battery of tests is helpful to "avoid this very situation," one where the employer suspects malingering or one in which there is a need to verify objectively signs of memory loss or cognitive dysfunction. (Bertics Transcript p. 33).
Case law illustrates that in "uncomplicated" cases, medical testimony may not even be necessary for plaintiff to make out a prima facie case. The "distinguishing features" of such cases include immediate appearance of symptoms, prompt reporting of the occurrence to the employee's supervisor, consultation with a physician, prior good health and freedom from disability. Slizewski v. International Seafood Inc., 46 N.C. App. 228,264 S.E.2d 810 (1980). Plaintiff reported his injury to Ms. Jones on the day of his injury and when the store manager was not present. He reported his injury to the store manager on the day following his injury. Plaintiff assisted the store manager in preparing Form 19 on the same day. Plaintiff sought and received medical care at Durham Urgent care on the day following his injury. Plaintiff suffered from no prior disability and the medical reports are clear that he was generally healthy prior to the injury. Plaintiff's case meets the criteria, and all testimony, medical reports and other documents show that evidence of every "distinguishing feature" of an uncomplicated case were presented as evidence. In addition to these features, the medical evidence unequivocally related plaintiff's injury and resulting disability to the events that he described. There is no requirement that plaintiff prove the "exact cause" of his accident. Battle v. Bryant Elec. Co., 15 N.C. App. 246,189 S.E.2d 788, cert. denied, 281 N.C. 755, 191 S.E.2d 353 (1972).
Deputy Commissioner Cramer found as a fact that Dr. Bertics based his assessment and diagnosis solely on the history given by plaintiff. Closed head injuries do not necessarily result in objective means of verifying such injuries absent a laceration. Plaintiff and Jones both testified that no laceration was present. Furthermore, whatever Dr. Bertics did find, it was confirmed by the neurocognitive evaluation done by Dr. Conder and by the report issued by Dr. Hurwitz (Food Lion's second opinion doctor).
Dr. Bertics related plaintiff's condition to his injury. Dr. Hurwitz agreed, stating that "I find no reason to doubt that this gentleman had a work related accident" in October of 1994 "where a heavy object hit him on the back of the head and the shoulders." (Defendant's Exhibit 1 to Hurwitz Transcript). Finally, when plaintiff was finally able to obtain the neurocognitive evaluation, Dr. Conder agreed with Bertics and Hurwitz, and did so based on objective criteria gleaned from the tests that he administered. Dr. Conder, in the summary portion of his neurocognitive evaluation report, stated that plaintiff showed "significant word retrieval problems" and "problematic" visual memory for both recall and recognition. (Exhibit W). Dr. Conder also noted that plaintiff "did not show a pattern of malingering." (Exhibit W). Dr. Conder concurred with previous diagnoses (post-concussion headaches) and also diagnosed "visual memory dysfunction." (Exhibit W).
Deputy Commissioner Cramer and the majority failed to address Dr. Conder's report at all, and merely concluded that there was no "objective evidence of an injury." Dr. Hurwitz's independent medical examination report was also based on objective tests that he administered, including the MMPI and Wechsler Adult Intelligence Survey. Both Dr. Conder and Dr. Hurwitz based their findings on these objective criteria, as well as other criteria.
In closed head injury cases where there are no cuts, bruises or other marks on the victim, there is no means other than the neurocognitive evaluation to determine if a patient suffers from cognitive dysfunction or related disorders. Taking Deputy Commissioner Cramer's and the majority's opinion to their logical conclusion, if the plaintiff suffers a closed head injury that no one else observes, the claim must be denied — even if objective testing confirms the initial diagnosis, fails to point to any cause outside of the events described by the injured employee, and even if the medical witness offer opinions relating the condition to the events described. Finding of Fact number 9 is not supported by the medical evidence introduced, mischaracterizes or ignores altogether Dr. Conder's report, ignores objective tests on which Dr. Hurwitz based his conclusions, and should be reversed for findings consistent with the same.
I VOTE TO REVERSE.
This 27th day of January, 1998.
 S/ _____________________ THOMAS J. BOLCH COMMISSIONER